**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.  1:15-cr-383-RBJ

UNITED STATES OF AMERICA,

     Plaintiff,

v.

2.    JESSE ERWIN,

     Defendant.

---

## MOTION FOR COMPASSIONATE RELEASE

---

     Mr. Jesse Erwin, through undersigned counsel, and pursuant to 18 U.S.C. 3582(c)(1)(A), submits this Motion for Compassionate Release to immediate home confinement.  The combination of Mr. Ewin's preexisting medical issues which put him at higher risk for severe COVID-19–associated disease, and his confinement at the Lompoc prison complex, which remains one of the worst COVID-19 outbreaks in the entire United States, constitute "particularly extraordinary and compelling circumstances that could not reasonably have been foreseen by the Court at the time of sentencing." 18 U.S.C. 3582(c)(1)(A).

     In addition, for Mr. Erwin, the conditions at Lompoc -- combined with his increased risks as described below -- pose an unreasonable and unjustifiable risk of future harm from the pandemic, violating the Eighth Amendment's prohibition against cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).

## I.      Procedural Background

On October 12, 2018, Mr. Erwin was sentenced to 58 months incarceration following guilty pleas to Wire and Securities Fraud.  He has served nearly 20 months in prison, which is roughly one-third of his total prison sentence.  According to the BOP website, Mr. Erwin's current release date is January 14, 2023.  Mr. Erwin seeks that the Court grant him compassionate release for the reasons stated in this Motion.  Undersigned counsel has conferred with Assistant United States Attorney Pegeen Rhyne who opposes the relief sought.

## II.      Mr. Erwin is Serving His Sentence at Lompoc, Where the Rate of Infection and Death Toll are Alarming and Among the Worst in the Nation

Mr. Erwin is serving his sentence at the Lompoc Federal Correctional Complex.  Mr. Erwin is currently incarcerated in a camp at Lompoc USP, where the current rate of infection and the death toll are alarming.  At the Federal Correctional Institution Lompoc, a low-security prison in Santa Barbara County, 900 inmates and 18 staff have tested positive as of June 2, 2020. In addition, 176 inmates and 24 staff members have become infected at the U.S. Penitentiary Lompoc, a neighboring medium-security prison on the same ground.  According to the BOP website as of the time of this filing three inmates have died from COVID-19 from the complex - two from USP and one from FCI.  www.bop.gov/coronavirus/.  However, news reports from June 1, 2020 indicate that a fourth inmate from the Lompoc prison complex died on June 1, 2020.  https://keyt.com/health/coronavirus/2020/06/01/fourth-inmate-at-lompoc-prison-dies-from-covid-19/.  Combined, the two federal prisons in Lompoc have had 1,076 infected inmates, according to the Bureau of Prisons, making it the worst outbreak at any federal correctional facility by far. www.latimes.com/california/story/2020-05-17/officials-mishandled-lompoc-terminal-island-prison-outbreaks-lawsuit.

Mr. Erwin's friend, Mr. Jimmie Lee Houston, with whom Mr. Erwin was visiting regularly, died on May 6, 2020 from COVID-19 complications. Mr. Houston was the second inmate from Mr. Erwin's facility at Lompoc to die from this deadly virus. On approximately May 27, 2020, Mr. Erwin learned that another one of his friends from his dorm at FCI not only contracted COVID-19, but had to be placed on a ventilator. According to Mr. Erwin, he languished on a bed in the dorm for five days with no intervention or treatment other than he was given a cane to walk and advice to drink water and take Tylenol. This fellow inmate and friend was a food server in Mr. Erwin's dorm.

On May 16, 2020, The American Civil Liberties Union filed a class-action lawsuit on behalf of federal prisoners at Lompoc, claiming officials mishandled coronavirus outbreaks. The lawsuit, which names Lompoc's warden, as well as Michael Carvajal, director of the federal Bureau of Prisons, claims that prison officials allowed the virus to spread by failing to provide clean environments, basic sanitary supplies and personal protective equipment to prisoners and staff. Overcrowding makes it impossible for prisoners to maintain social distancing or take other precautions, but officials have refused to consider the majority of inmates for release into home confinement despite directives that they do so, according to the lawsuit. *Id.* While officials claim that they have been trying to mitigate the outbreak to the extent possible, inmates remain in close proximity with one another and staff, and therefore, Mr. Erwin is not able to self-quarantine while incarcerated. The lawsuit states that Lompoc has failed to reduce crowding and take precautions to slow the spread of the virus and that officials have not provided inmates who have become infected with adequate medical care. *Id.*

Mr. Erwin attaches and incorporates the accounts of the named petitioners in the ACLU lawsuit, who are inmates at Lompoc, to support his assertion that the conditions and policies at Lompoc place him at significant risk to contract COVID-19, and if he does, he will not receive the necessary medical attention if he remains incarcerated at Lompoc.  (*See* Attachment A – Complaint – Class Action For Declaratory and Injunctive Relief and Petition for Writ of Habeas Corpus filed May 16, 2020.)  Mr. Erwin lives in a barracks-style facility with approximately 150 people in bunk beds in the same large room.  Both vertically and horizontally, the beds are far less than 6 feet apart.  The 150 inmates in his barracks-like facility share 3 urinals, 7 stalled toilets, and 7 showers.  Mr. Erwin indicates that they are constantly running out of hand soap in his barracks.  The attached lawsuit describes the housing conditions at the open-plan dormitories where Mr. Erwin resides: "[T]here are no internal walls, and the prisoners sleep on bunk beds that are no more than 2-to-3 feet from each other. There is no air conditioning and ventilation is extremely poor.  Over a hundred prisoners must stand in line outside to pick up their meals, and 25-30 people stand in line outside a tiny five-foot-by-five-foot room to pick up their medication."  As will be described below, Mr. Erwin has medical conditions that require him to receive medication twice daily.

Like the petitioners in the lawsuit, Mr. Erwin describes inadequate and ineffective testing and treatment.  He indicates that Lompoc officials are not testing people in the camp, where he is housed, until after they are already very ill.  Mr. Erwin witnessed this lack of medical intervention with both his friend who died and his friend who is currently on a respirator.  Mr. Erwin has not been tested for COVID-19.  As noted in the attached lawsuit, Mr. Erwin similarly describes that inmates who report symptoms are taken to the SHU or a medical area (believed to

be an old "chow hall") that is moldy, unsanitary, and urine-soaked, where there is no shower. This discourages early self-reporting by inmates.

When Mr. Erwin's friend, Mr. Houston, became sick, he was too weak to get out of bed. He was vomiting constantly and had lost control of his bowels.  Despite these significant symptoms, Mr. Houston remained in the same barracks area with the other 150 inmates and was not given medical treatment.  Instead, the other inmates, including Mr. Erwin, tried to help Mr. Houston.  Mr. Erwin and others would do their best to clean the vomit and feces from Mr. Houston.  Ultimately, prison officials took Mr. Houston to the medical area where he died from COVID-19.  Mr. Erwin describes a similar account to his friend who was recently tested positive for COVID-19 and is currently believed to be on a respirator.

### III.    COVID-19 Transmission and Prison Conditions

The novel coronavirus outbreak is wreaking havoc in the BOP, and in particular the prison complex where Mr. Erwin is incarcerated.  COVID-19 is a highly infectious respiratory illness that can spread from person to person. https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.  To protect oneself from contracting COVID-19, the CDC has published advice that individuals socially distance themselves from other individuals at a distance of six feet. https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html. Following these guidelines, however, is not realistic in facility where Mr. Erwin is housed.

As of the filing of this Motion, in the United States, there are currently 1,787,680 confirmed COVID-19 cases and 104,396 deaths. In California, where Mr. Erwin is incarcerated, there have been 113,006 confirmed positive cases and 4,21 deaths.   These numbers continue to rise and almost certainly underrepresent the true scope of the crisis in the U.S. given the limited

availability of testing to detect the virus. *See* Abby Goodnough et al., *Testing Falls Woefully Short as Trump Seeks an End to Stay-at-Home Orders*, New York Times (Apr. 15, 2020).  When the ACLU lawsuit was filed, the 924 people incarcerated in Lompoc who had tested positive for the virus represented more than 65% of positive tests in all of Santa Barbara County where the prison facilities are located.  www.aclusocal.org/en/press-releases/lawsuits-filed-behalf-terminal-island-and-lompoc-prisoners.

In granting a motion for compassionate release in *United States v. Jenkins*, 99-cr-439, Senior United States District Judge Kane noted that correctional facilities – like long-term care facilities and cruise ships – simply do not allow for inmates to practice and achieve social distancing.  An editorial in The Washington Post by medical professionals and experts describes how the COVID-19 coronavirus spread rapidly in Chinese correctional facilities, advising that, even if the flow of staff, new inmates, attorneys, and visitors "is limited to the extent possible, correctional facilities remain densely populated and poorly designed to prevent the inevitable rapid and widespread dissemination of this virus." Josiah Rich, Scott Allen, and Mavis Nimoh, *We must release prisoners to lessen the spread of coronavirus*, The Washington Post (March 17, 2020), https://www.washingtonpost.com/opinions/2020/03/17/we-must-release-prisoners-lessen-spread-coronavirus (last visited May 8, 2020). Part of the intractable nature of the disease is that individuals can spread it days before they show symptoms, *see* Wycliffe E. Wei et al., *Presymptomatic Transmission of SARS-CoV-2 — Singapore, January 23–March 16, 2020*, 69 Morbidity & Mortality Weekly Rep. 411, 412, *available at* http://dx.doi.org/10.15585/mmwr.mm6914e1 ("The potential for presymptomatic transmission underscores the importance of social distancing, including the avoidance of congregate settings, to reduce COVID-19 spread.").

This pandemic is not a problem that will resolve itself in short order. Experts indicate we are just beginning our war against COVID-19. *See, e.g.*, Testimony of Tom Frieden before House Appropriations Subcommittee at 3 (May 6, 2020), available at https://docs.house.gov/meetings/AP/AP07/20200506/110747/HHRG-116-AP07-Wstate-FriedenT-20200506.pdf ("[A]s bad as this has been so far, we're just at the beginning.").  While summer weather may help slow transmission, Dr. Mark Lipsitch, a professor of epidemiology at the Harvard T.H. Chan School of Public Health and director of the Center for Communicable Disease Dynamics, predicts that "fall will be very much like the spring," and the usual pattern of coronaviruses will likely continue with new transmission peaking in November and cases peaking in December.  https://www.ama-assn.org/delivering-care/public-health/harvard-epidemiologist-beware-covid-19-s-second-wave-fall.   And as one federal court has already noted, in a case dealing with a similar ongoing crisis at the Elkton facility: "Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities." *United States v. Rodriguez*, No. 2:03-cr-0271, 2020 WL 1627331, (E.D. Pa., Apr. 1, 2020).   This danger is playing out with disastrous consequences at Lompoc.

## IV.   Mr. Erwin's Increased Risk

Mr. Houston, an inmate from Lompoc who recently died from COVID 19 while being ignored and neglected by prison officials, had preexisting medical conditions. https://www.independent.com/2020/05/07/lompoc-prison-reports-second-covid-19-death/.  Mr. Erwin does as well. According to Mr. Erwin's PSIR and the letter from Dr. Stoermer, Mr. Erwin suffers from a number of very serious medical conditions.  He has been and is currently being

treated for insulin dependent diabetes, high blood pressure, leg spasms and hypertension.  PSIR, Doc. #248, ¶74.   Mr. Erwin requires daily medication, including multiple doses of insulin per day.  While Mr. Erwin has requested his medical records, he has been told not expect to receive them anytime soon.  Mr. Erwin reports that he takes the following medications on a daily basis to treat his medical conditions:

- Metformin – 1000 mg for diabetes

- Insulin NPH – 100 units in the morning and 10 units at night for diabetes

- Regular Insulin – 100 units in the morning for diabetes

- Lisinopril – 40 mg for high blood pressure

- Atorvastatin – 10 mg for high cholesterol

- Hydrochlorothiazide – 12.5 mg for high blood pressure

- Amitriptyline – 75 mg for leg pain

- Capsaicin Crema – 60 gm for pain

- Acetaminophen – 325 mg for pain

At the time of his PSIR interview, Mr. Erwin was 5'8'' and weighed 230 pounds.  According to the current BMI index, Mr. Erwin is classified as obese and is at a very high disease risk relative to normal weight men.  While Mr. Erwin reports that he has lost a little weight, he still falls in the obese category.

Mr. Erwin's obesity put him at an even greater risk of severe complications from COVID-19. *See, e.g.*, Norbert Stefan et al., *Obesity and impaired metabolic health in patients with COVID-19*, Nature Revs. Endocrinol. (Apr. 23, 2020), https://www.nature.com/articles/s41574-020-0364-6 (hypothesizing based on preliminary data that "a high BMI

might be an important risk factor for a severe course of disease"). Researchers in France have concluded that the severity of COVID-19 illness increases with body mass index and warned that "[p]atients with obesity and especially those with severe obesity should take extra measures to avoid COVID-19 contamination by enforcing prevention during the current pandemic." Arthur Simmonet et al., *High prevalence of obesity in severe acute respiratory syndrome coronavirus-2 (SARS-CoV-2) requiring invasive mechanical ventilation*, Obesity (Apr. 9, 2020), https://doi.org/10.1002/oby.22831 (last visited May 8, 2020). In New York City, researchers concluded, "[T]he chronic condition with **the strongest association with critical illness was obesity**, with a substantially higher odds ratio than any cardiovascular or pulmonary disease." Petrilli et al., *Factors associated with hospitalization and critical illness among 4,103 patients with COVID-19 disease in New York City*, medRxiv (Apr. 11, 2020), https://www.medrxiv.org/content/10.1101/2020.04.08.20057794v1 (emphasis added).

Recent reports released by the CDC also indicate that Mr. Erwin is at an increased risk for severe COVID-19 associated disease than persons without his medical conditions. "Based on preliminary U.S. data, persons with underlying health conditions such as **diabetes mellitus**, chronic lung disease, and **cardiovascular disease**, appear to be at higher risk for severe COVID-19–associated disease than persons without these conditions." Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020. MMWR Morb Mortal Wkly Rep 2020;69:382–386. DOI: http://dx.doi.org/10.15585/mmwr.mm6913e2. (emphasis added).

Another report published on April 17, 2020 states, "Among 178 (12%) adult patients with data on underlying conditions as of March 30, 2020, 89.3% had one or more underlying

conditions; the most common were **hypertension** (49.7%), **obesity** (48.3%), chronic lung

disease (34.6%), **diabetes mellitus** (28.3%), and **cardiovascular disease** (27.8%)." (emphasis

added.)  Garg S, Kim L, Whitaker M, et al. Hospitalization Rates and Characteristics of Patients

Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States,

March 1–30, 2020. MMWR Morb Mortal Wkly Rep 2020;69:458–464. DOI:

http://dx.doi.org/10.15585/mmwr.mm6915e3external icon.

       According to the CDC, people who suffer from certain underlying medical conditions

face elevated risk.  Such conditions include chronic lung disease, moderate to severe asthma,

serious heart conditions, hypertension, high blood pressure, chronic kidney disease, liver disease,

diabetes, compromised immune systems (such as from cancer treatment, HIV, autoimmune

disease, or use of immunosuppressing medication for other conditions), and severe obesity.  One

analysis found mortality rates of 13.2% for patients with cardiovascular disease, 9.2% for

diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.

World Health Org., Report of the WHO-China Joint Mission on Coronavirus Disease 2019

(COVID-19) at 12 (Feb. 28, 2020), World Health Org., Report of the WHO-China Joint Mission

on Coronavirus Disease 2019 (COVID-19) at 12 (Feb. 28, 2020),

https://www.who.int/docs/defaultsource/coronaviruse/who-china-joint-mission-on-covid-19-

final-report.pdf.

       Additionally, Mr. Erwin is 53 years old.  People over the age of fifty face a greater risk of

serious illness or death from COVID-19. Xianxian Zhao, et al., Incidence, clinical characteristics

and prognosticfactor of patients with COVID-19: a systematic review and meta-analysis,

MEDRXIV (Mar. 20,2020), https://cutt.ly/etRAkmt.  In a February 29, 2020 preliminary report,

individuals age 50-59 had an overall mortality rate of 1.3%.  Worldometer, Age, Sex, Existing Conditions of COVID-19 Cases and Deaths Chart (May 13, 2020), https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report).

As noted in the attached lawsuit, Dr. Shamsher Samra, a noted physician with ample experience working with incarcerated individuals, delivers an urgent warning: "BOP should take immediate steps to dramatically downsize the population at Lompoc, with priority given to those at high risk of harm due to their age and health status and thus are likely to require a disproportionate amount of medical resources."  (Attachment A – p. 6, para. 8).

As an obese 53-year-old man with underlying health conditions of hypertension and diabetes, Mr. Erwin is more vulnerable to severe COVID-19 disease and even death.  While he is incarcerated at Lompoc, he is not only in one of the highest contaminated environments in the United States, but while he is incarcerated, he is unable to protect himself as he could on home detention.  This combination of Mr. Erwin's underlying health conditions, the rampant outbreak at Lompoc Prison Complex, and the inability for Mr. Erwin to completely isolate or quarantine from other infected individuals, constitute particularly extraordinary and compelling circumstances that could not reasonably have been foreseen by the Court at the time of sentencing.

### V.        Authority to Release Mr. Erwin to Home Confinement Immediately

The United States Attorney General directed the BOP to prioritize the use of home confinement for certain inmates.  Attorney General Barr states that "there are some at-risk inmates who are non-violent and post minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." Memorandum from

Attorney General William Barr to Director of Bureau of Prisons, Prioritization of Home

Confinement As Appropriate in Response to COVID-19 Pandemic (March 26,2020).

Subsequent to the Attorney General's Memorandum, on May 8, 2020, the DOJ Acting Assistant

Director of the Correctional Programs Division and the Assistant Director of Reentry Services

Division issued a memorandum for Chief Executives Officers about Home Confinement. The

Memorandum indicates, "In our continued effort to protect the health and safety of staff and

inmates during the COVD-19 pandemic, it is imperative to review at-risk inmates for placement

on home confinement."   The ACLU lawsuit alleges that while Congress gave prisons broad

authority to release low risk offenders into home confinement so that it could reduce

overcrowding and save lives, Lompoc officials failed to use that authority.

www.aclusocal.org/en/press-releases/lawsuits-filed-behalf-terminal-island-and-lompoc-

prisoners.

The BOP no longer retains its monopoly on § 3582(c)(1)(A) compassionate release

motions.  Instead, federal prisoners for whom the BOP has refused to file such a motion may now

file their own § 3582(c)(1)(A) motions with the original sentencing court when the BOP has

either denied their request or after 30 days has passed without a decision.  18 U.S.C. § 3582(c)(1)

authorizes the court to reduce a defendant's term of imprisonment "upon motion of the Director

of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted

all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the

defendant's facility, whichever is earlier.  18 U.S.C. § 3582(c)(1)(A).  When presented with the

requisite motion, § 3582(c)(1) permits the court to grant the sentence reduction if, "after

considering the factors set forth in § 3553(a) to the extent that they are applicable," the court

finds that "extraordinary and compelling reasons warrant such a reduction" and that "such a

reduction is consistent with the applicable policy statements issued by the Sentencing

Commission." *Id*. § 3582(c)(1).

Mr. Erwin has been attempting to comply with the statute in this regard, but has been

denied the ability to make timely requests by the prison itself.  Since the beginning of April

2020, Mr. Erwin has been requesting the form to make his request of the warden for

compassionate release.  Upon information and belief, Mr. Erwin submitted his first request for

compassionate release on April 22, 2020 to the previous acting warden.  Despite his repeated

and ongoing requests for a particular form, Mr. Erwin was not given the form from Lompoc

officials until May 15, 2020 when a new assistant warden finally provided him the form he had

been requesting for over 30 days.   Upon information and belief, Mr. Erwin was finally able to

submit the form request to the new warden on May 17, 2020.  Mr. Erwin has not received any

response to either of his requests for compassionate release.

As Lompoc has in essence denied Mr. Erwin the ability to pursue and exhaust

administrative remedies in a timely manner, Mr. Erwin should not be penalized, and his health

further jeopardized, for the prison's conduct.  The attached ACLU lawsuit describes an inmate

at Lompoc, Mr. Garcia, who was housed, as Mr. Erwin, in a low-security facility at Lompoc,

was also denied access to the administrative remedy process.  Mr. Garcia indicates that he

attempted to submit an application for compassionate release to the warden, but that staff have

not been accepting forms required to initiate the process, claiming they cannot do so due to the

exigency of the COVID-19 pandemic.  *See* Attachment A – p. 8, para. 13.

If the Court does not deem his request to the previous warden on April 22, 2020 sufficient, under these circumstances, Mr. Erwin requests that this Court excuse the so-called exhaustion rule.  First, the rule is, in part, an administrative exhaustion requirement, and such requirements are typically subject to exception where, for example, "exceptional circumstances of peculiar urgency exist." *Hendricks v. Zenon*, 933 P.2d 664, 672 (9th Cir. 1993)(*quoting Granberry v. Greer*, 481 U.S. 129, 134 (1987)), or exhaustion would be futile, *see Garza v. Davis*, 596 F.3d 1198, 1204 (10th Cir. 2010)(recognizing "futility" to administrative exhaustion requirement).  In this case, Mr. Erwin's risk of serious COVID-19 illness combined with his confinement in a prison where he cannot socially distance and is surrounded by numerous inmates and staff who have contracted the virus constitute exceptional circumstances of peculiar urgency.  While he does not have a copy of his request, Mr. Erwin submitted a request to  the former acting warden more than 30 days ago.  Subsequent to Mr. Erwin learning that there was a new warden, Mr. Erwin began requesting the form to do another request to the new warden.  Mr. Erwin was denied access to the form for several weeks.  According to the ACLU lawsuit, the warden has refused to consider the majority of inmates for release into home confinement despite directives that they do so.  So, there is futility to the administrative exhaustion requirement.

Further, the so-called exhaustion rule is not jurisdictional. While federal courts "ha[ve] sometimes been profligate in its use of the term" *Arbaugh v. Y&H Corp.,* 546 U.S. 500, 510 (2006), recent Supreme Court precedent have clarified that a statutory restriction is truly "jurisdictional" only when "Congress has clearly stated that the rule is jurisdictional," *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (alteration and citation omitted).  Because §

14

3582(c)(1)(A) contains no such clear statement, its hybrid exhaustion rule is "nonjurisdictional in character." *Haney*, 2020 WL 1821988, at *2. The requirement is an ordinary claims-processing rule that "simply delineates the process for a party to obtain judicial review." *Id.* Indeed, the government has conceded as much in other cases. *E.g., United States v. Gentille*, No. 19-cr-590, 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020) (noting government concession that the rule is a nonjurisdictional claims-processing rule). In the *United States v. Trujillo*, the Ninth Circuit noted in the context of a different subsection of § 3582, namely (c)(2), the term "jurisdictional" "is ordinarily not the correct classification for 'claim-processing rules' such as temporal or, as here, numerical limitations on motions addressed to the same tribunal." 713 F.3d 1003, 1006-07 (9th Cir. 2013). To the extent that courts in this district have reached the contrary conclusion, e.g*., United States v. Perry*, No. 18-cr-480-PAB, 2020 WL 1676773, at *2 (D. Colo. Apr. 3, 2020); *United States v. Soto,* No. 16-cr-00138-CMA, 2020 WL 1875147, at *1 (D. Colo. Apr. 15, 2020), those decisions are contrary to the conclusions of other courts nationwide.

The release of Mr. Erwin is required to advance the urgent priority of immediate decarceration, to protect both Mr. Erwin and the community. Therefore, to order a sentence to home detention now, Mr. Erwin urges this Court to excuse any perceived non-compliance with the so-called exhaustion rule. As numerous courts have recognized, the COVID-19 pandemic is an exceptional circumstance, in light of which strict compliance with the 30-day requirement could "result[] in catastrophic health consequences," particularly for vulnerable prisoners, that would "make exhaustion futile" or render the relief requested "inadequate." *United States v. Perez*, ---F. Supp. 3d---, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020); *see also, e.g., Atkinson*, 2020 WL 1904585, at *2 (same); *United States v. Ben-Yhwh*, No. 1:15-cr-830-LEK,

Dkt. No. 206 (D. Hawaii Apr. 13, 2020) (same); *United States v. Smith,* No. 1:12-cr-133-JFK, 2020 WL 1849748, at *3-4 (S.D.N.Y. Apr. 13, 2020) (same); *United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (same); *Miller v. United States*, No. 16-20222-1, 2020 WL 1814084, at *2-3 (E.D. Mich. Apr. 9, 2020) (as an alternative basis for relief, excusing compliance with hybrid exhaustion rule in light of COVID-19 and granting immediate release); *United States v. McCarthy,* No. 3:17-CR-0230, 2020 WL 1698732, at *3-4 (D. Conn. Apr. 8, 2020) (excusing compliance with hybrid exhaustion rule in light of COVID-19 and granting immediate release); *United States v. Zukerman,* No. 1:16-cr-194-AT, 2020 WL 1659880, at *2-4 (S.D.N.Y. Apr. 3, 2020) (same); *United States v. Colvin*, No:3:19cr179, 2020 WL 1613943, at *2 (Apr. 2, 2020) (same); *United States v. Powell*, No. 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020) (same); *cf. In re Extradition of Toledo Manrique*, No. 19-mj-71055, at *1 (N.D. Cal. Mar. 19, 2020) (refusing to delay consideration of release to await evidence of an outbreak in jail because that "may be too late"). Under these circumstances, the Congressional "objective of meaningful and prompt judicial resolution is clearly best served by permitting [movants] to seek relief before the 30-day period has elapsed." *Haney*, 2020 WL 1821988, at *4.

### VI.    The Conditions at Lompoc, Combined with Mr. Erwin's Increased Medical Risks, Violate his Eighth Amendment Rights

For Mr. Erwin, the conditions at Lompoc combined with his increased risks – as described herein – pose an unreasonable and unjustifiable risk of future harm from the pandemic, violating the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.' . . . . It would be odd to deny an injunction to inmates who plainly proved an

16

unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to

them."). As detailed in the ACLU: "The actions and inactions of Lompoc officials will lead to a

death sentence for some. This deliberate indifference amounts to cruel and unusual punishment

prohibited by the Eighth Amendment." Attachment A – p. 4, para. 5.  Given his underlying

health problems, Mr. Erwin's ongoing detention during the unprecedented public health crisis

created by the COVID-19 pandemic results in a threat "so grave that it violates contemporary

standards of decency to expose anyone unwillingly to such a risk." *Helling*, 509 U.S. at 36.

## VII.    Proposed Home Confinement Plan and 3553(a) Factors

Sadly, Mr. Erwin's mother, Barbara Erwin, passed away in February 2020.  At the time

of her passing, she owned the home where Mr. Erwin was raised, 20516 Sunset Drive in

Warrensville Heights, Ohio.  *See* PSIR, Doc. 248 at 14 para. 70.  Ms. Erwin left the home to Mr.

Erwin.  If granted compassionate release by converting Mr. Erwin's sentence to home detention,

Mr. Erwin would request being detained at this home.  The home is a single-family residence,

and nobody is currently living there.  Given that Mr. Erwin has been in contact with many

COVID-19 positive people, residing in a home where he will be alone and can quarantine is

ideal.

In addition to having a vacant single-family residence where he could reside, Mr. Erwin's

personal characteristics make him a good candidate for home detention.  Other than this case,

Mr. Erwin has no criminal history whatsoever.  He has no history of violence.  Until being

charged in this case, Mr. Erwin had worked his entire adult life.  He received a Juris Doctorate

degree from the College of William and Mary in 1992.  Mr. Erwin was compliant with all of the

terms of his pretrial release for a period of approximately ***three years of pretrial supervision***.

*See* PSIR, Doc. 248 at 3 para. 6 (emphasis added).  According the PSIR, Mr. Erwin does not

have a substance abuse problem.  Based on his lack of criminal history, employment history,

demonstrated compliance with court orders, and personal characteristics, Mr. Erwin does not

appear to pose a risk to the community or to recidivate.

### VIII.   Release to Home Confinement is Consistent with Other Rulings in the District of Colorado

In a case where the defendant had similar characteristics to Mr. Erwin's, Senior Judge

Kane granted compassionate release.  The defendant in that case, Walter Jenkins, is 7 years older

than Mr. Erwin and his obesity was cited by Judge Kane has putting him at an even greater risk

of severe complications from COVID-19.  Mr. Jenkins was scheduled to be released in roughly 2

½ years, in October of 2022, after serving 274 months.  In his ruling, Judge Kane indicates,

> Consequently, I find extraordinary and compelling circumstances exist. The basic meanings of the words "extraordinary" and "compelling" underscore my conclusion. The most relevant definition for "extraordinary" in Black's Law Dictionary is "[b]eyond what is usual, customary, regular, or common." *Extraordinary*, Black's Law Dictionary (11th ed. 2019). The COVID-19 pandemic is exactly that—beyond the usual. And being at a higher risk for an outcome is by its nature uncommon. Black's contains no definition for "compelling" or "compelling reason" but defines "compelling need" as a "need so great that irreparable harm or injustice would result if it is not met." *Compelling Need*, Black's Law Dictionary (11th ed. 2019). Severe complications or death from COVID-19 would unquestionably be irreparable harm, and being forced to endure an even greater risk would be unjust. This battle for lives is "[b]eyond what is usual, customary, regular, or common" and, in Mr. Jenkins' case, implicates "irreparable harm or injustice."

Mr. Jenkins was imprisoned at FCI Englewood, which is reporting that one staff member

and no inmates have tested positive.  Obviously, this is not even in the same ballpark as the

Lompoc crisis.  In the recent case of *United States v. Brewington*, 15-cr-73-PAB, Chief Judge

Brimmer granted release on bond for a defendant who was incarcerated at Lompoc and waiting

to be re-sentenced after an appeal.  (*See* Attachment B – Transcript of Proceedings, April 28,

2020.)  Mr. Brewington provided his testimony by phone on April 28, 2020, approximately one

month before the submission of this motion.  Mr. Brewington testified under oath as to the

conditions at the camp at Lompoc, where Mr. Erwin is currently housed.  Mr. Erwin incorporates

Mr. Brewington's testimony as support for the factual assertions contained in this Motion.  After

hearing from Mr. Brewington about the conditions at the camp, Chief Judge Brimmer stated:

> But given the conditions that exist at the camp and all of the information that both
> sides have submitted and which Mr. Brewington has indicated through his
> statements today show, camps are just really not good places for a person with Mr.
> Brewington's health problems. And even if Mr. Brewington is conscientious, and it
> sounds like he has been, he still is simply wearing a cloth mask. He doesn't have an
> N95 mask. And a lot of other inmates don't wear them. And he is in a relatively
> confined space close to other people all night long, and he can't wear a mask
> because he has his CPAP machine, and other inmates don't wear them even though
> they have been told to. I mean, it's just really impossible for Mr. Brewington not to
> come in contact with a large number of other people, some of whom, of course,
> could be asymptomatic. You just don't know.

### IX.   Conclusion

Mr. Erwin, whose unique medical conditions make him particularly vulnerable to severe

complications of COVID-19, is confined at the prison complex that is one of the worst COVID-

19 outbreaks in the United States and has the highest number of inmates who have tested positive

for this deadly virus.  Mr. Erwin has a vacant single-family home where he could serve home

detention for the remainder of his sentence.  His characteristics and demonstrated compliance

with supervision over three years suggest that he will be compliant with home detention.  Given

the unprecedented public health crisis posed by the COVID-19 pandemic and the extreme and

immediate risk posed by Mr. Erwin's continued confinement at the Lompoc prison complex,

there are extraordinary and compelling reasons to modify Mr. Erwin's sentence to permit his

immediate release to home confinement. Moreover, his continued detention at Lompoc is in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

Dated this 3rd day of June, 2020.

Respectfully submitted,

 *s/ Dru Nielsen*
Dru Nielsen, #28775
Eytan Nielsen LLC
3200 Cherry Creek South Drive
Suite 720
Denver, CO  80209
(720) 440-8155
(720) 440-8156
dru@eytan-nielsen.com
Counsel for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this Wednesday, June 3, 2020, a true and correct copy of the foregoing with the Clerk of the Court by CM/ECF system and to all attorneys of record.


_s/ Dru Nielsen_